**BACK VENTURES, L.L.C. SERIES D, Appellant,**

v.

**SAFEWAY, INC., Respondent.**

**No. WD 75837.**

Missouri Court of Appeals, Western District.

Aug. 6, 2013.

Anthony L. Gosserand, Kansas City, MO, for appellant.

Patrick K. McMonigle, Patrick J. Kaine, Kansas City, MO, for respondent.

Before Division Three: LISA WHITE HARDWICK, Presiding Judge, and MARK D. PFEIFFER and CYNTHIA L. MARTIN, Judges.

MARK D. PFEIFFER, Judge.

Back Ventures, L.L.C. Series D ("Back Ventures") appeals from the judgment entered by the Circuit Court of Clay County, Missouri ("trial court"), in which the trial court granted summary judgment to Safeway, Inc. ("Safeway"), in Back Ventures' suit for breach of a lease agreement. Because we must review the record in the light most favorable to the party against whom summary judgment was entered and accord the non-movant the benefit of all reasonable inferences from the record, we conclude that summary judgment was error. Thus, we reverse and remand for further proceedings consistent with this opinion.

### Factual and Procedural History [1]

On January 16, 1953, Louis and Sylvia Weinstein (the "Weinsteins") entered into a lease (the "Lease") with Safeway Stores Incorporated ("Safeway Stores") for the rental of certain improved real property, commonly known and numbered as 1815 Burlington Avenue, North Kansas City, Clay County, Missouri (the "leased premises"), for thirty years commencing April 1, 1953, and expiring March 31, 1983. Back Ventures is the successor in interest to the Weinsteins, and Safeway is the successor in interest to Safeway Stores. Safeway Stores operated a grocery store in the leased premises until November 1962.

1. "On appeal from the grant of a motion for summary judgment, we view the facts in the light most favorable to the nonmovant." *C–H* *Bldg. Assocs., LLC v. Duffey,* 356 S.W.3d 862, 863 n. 1 (Mo.App.W.D.2012).

Thereafter, Safeway Stores and its successors in interest to the Lease subleased the leased premises to various tenants. In 1982 and 1988, Safeway Stores exercised options to extend the term of the Lease, with the term finally expiring on March 31, 2013.

On November 30, 1987, Safeway Stores transferred all of its interest as lessee under the Lease to Property Development Associates ("PDA"). Pursuant to an Asset Purchase Agreement dated January 15, 1988, SunWest Development Co., Inc., purchased the assets of PDA. On April 18, 1988, PDA assigned all of its interest in the Lease to SunWest N.O.P., Inc. ("SunWest"). On April 28, 1988, PDA notified Back Ventures' predecessor in interest that it had transferred and assigned its interest in the Lease to SunWest. The Lease gave the lessee the "right to assign or transfer the lease," but provided that "[s]hould lessee assign this lease it shall nevertheless remain liable to lessor for full payment of the rent and lessee's other obligations under this lease." When PDA notified Back Ventures of the assignment to SunWest, it advised, consistent with the Lease, that it "hereby acknowledges and confirms its continued liability for the payment of rent and performance of the tenant's obligations following the above referenced assignment as required by the assignment and subletting provision of said [L]ease."

In 1997, a dispute arose regarding the allegedly deteriorating condition of the leased premises. Initial efforts to resolve the dispute were not successful. Back Ventures' attorney, Sherwin Epstein, sent a letter dated November 12, 1997 (the "1997 Letter"), to, among others, Safeway Stores, PDA,[2] and SunWest, stating that "[n]otice is hereby given that [Back Ventures] has elected to declare the term of

the above-referenced lease ended because of the tenant's failure to perform its covenants and agreements under the lease." The 1997 Letter also made a demand for possession of the premises. SunWest did not relinquish possession of the premises. Back Ventures did not take any action to remove SunWest from the premises. Rather, SunWest thereafter made repairs and improvements to the leased premises, and continued to pay rent, which Back Ventures accepted. The record is silent as to the communications between Back Ventures and SunWest following and in response to the 1997 Letter.

In 2008, another dispute arose regarding the allegedly deteriorating condition of the leased premises. On this occasion, Back Ventures filed suit against both SunWest and Safeway for breach of the Lease (the "2008 Lawsuit"). The 2008 Lawsuit sought possession of the leased premises and monetary damages for default from both SunWest and Safeway. Safeway tendered the defense of the 2008 Lawsuit to SunWest pursuant to an indemnification agreement relating to the Lease. Back Ventures subsequently dismissed the 2008 Lawsuit. SunWest remained in possession of the leased premises and continued to pay rent in the amount required by the Lease. The record does not indicate that Safeway responded to the 2008 Lawsuit with the claim that its obligations under the Lease had been previously terminated by the 1997 Letter or because Back Ventures had failed to provide it written notice about SunWest's failures to perform the Lease.

At all relevant times before and after the 1997 Letter and the 2008 Lawsuit, SunWest remained in continuous possession of the leased premises. Likewise, pursuant to the terms of the Lease, Sun-

---

2. PDA was dissolved in 2000, and Safeway is its successor.

West made rent payments to Back Ventures through December 2009, made property tax payments through 2008, and maintained insurance for the leased premises through 2009.

In December 2009, SunWest contacted Back Ventures and informed Back Ventures that SunWest would no longer meet its obligations under the Lease, thereby surrendering the leased premises. In turn, Back Ventures contacted Safeway in February 2010 regarding its position on the alleged default status of the Lease and, particularly, the current deteriorated condition of the surrendered leased premises. Safeway responded by obtaining an inspection of the leased premises, obtaining property repair bids from Metropolitan Construction Services (July 2010) and Mid–America Contractors, Inc. (December 2010), and obtaining insurance coverage for the leased premises (consistent with the requirements of the Lease). Safeway engaged in discussions regarding Back Ventures' claims that Safeway was obligated for breach of the Lease but, ultimately, those discussions did not lead to resolution, and Back Ventures filed the underlying lawsuit against SunWest and Safeway in 2011 (the "2011 Lawsuit"). Due to imminent condemnation and demolition by the City of North Kansas City, Missouri, Back Ventures demolished the leased premises at its expense and sought reimbursement from Safeway for those expenses, and other damages, in the 2011 Lawsuit.[3]

Safeway did not tender the defense of the 2011 Lawsuit to SunWest and, instead, filed a separate answer to the 2011 Lawsuit. Thereafter, Safeway filed a motion for summary judgment, asserting that Back Ventures terminated the Lease in 1997 as a result of the 1997 Letter, and that Safeway had no further legal obligation under the Lease as a result. Safeway further alleged that after November 13, 1997, Back Ventures did not provide Safeway notice of any kind relating to the Lease until February 2010. Safeway further asserted that between November 1997 and February 2010, Back Ventures provided no notice to Safeway of any default under the Lease; did not request or advise Safeway of any separate agreements or arrangements it made with SunWest concerning maintenance of the leased premises; and did not notify Safeway that the leased premises had been vacant since 2000[4] or that SunWest continued to make payments under the Lease while leaving the leased premises vacant. Safeway also raised the affirmative defenses of waiver, estoppel, and laches, and contended that Missouri's five-year statute of limitations, § 516.120, applied to Back Ventures'

3. Back Ventures alleged in Count I of the 2011 Lawsuit that SunWest and Safeway breached the terms of the Lease in that Back Ventures had not received rent payments pursuant to the Lease since December 2009 and was owed $10,970.10 for back rent; that it had not received reimbursement for its payment of property taxes on the leased premises for 2009 and 2010 and, pursuant to the Lease, was owed $11,855.46 for payment of property taxes; and that it incurred costs in excess of $25,000.00 to demolish the leased premises due to SunWest's and Safeway's failure to adequately maintain the leased premises. Back Ventures alleged in Count II that when the leased premises were abandoned, SunWest and Safeway did not surrender the leased premises in good condition, ordinary wear and tear excepted, as required under paragraph Sixth of the Lease, and allowed the leased premises to suffer waste.

4. Though vacant since 2000 (because no grocery store or other business was in operation on the leased premises), SunWest remained "in possession" of the leased premises as it continued to pay rent until it gave notice of its intent to surrender.

claims under the Lease.[5] Back Ventures opposed Safeway's motion for summary judgment. The trial court granted summary judgment to Safeway by a September 24, 2012 docket entry.

SunWest, although properly served, failed to file an answer to the 2011 Lawsuit. On October 31, 2012, the trial court entered a "Judgment of Default against SunWest and a Final Judgment." In its judgment, the trial court noted that it had previously granted Safeway, Inc.'s Motion by a September 24, 2012 docket entry and that it was now entering final judgment in Safeway's favor on all counts raised against it in the 2011 Lawsuit.

Back Ventures timely appeals.

### Standard of Review

The propriety of summary judgment is purely an issue of law, and appellate review is essentially *de novo*. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). We review the record in the light most favorable to the party against whom judgment was entered and accord the non-movant the benefit of all reasonable inferences from the record. *Id.* We do not defer to the trial court's order granting summary judgment. *Id.*

"The purpose of summary judgment under Missouri's fact-pleading regime is to identify cases (1) in which there is no genuine dispute as to the facts and (2) the facts as admitted show a legal right to judgment for the movant." *Id.* at 380. Facts in support of a party's summary judgment motion, set forth by affidavit or otherwise, are taken as true, unless the non-moving party's response contradicts them. *Id.* at 376. "The key to summary

judgment is the undisputed right to judgment as a matter of law; not simply the absence of a fact question." *Id.* at 380.

"Where a 'defending party' will not bear the burden of persuasion at trial, that party need not controvert *each* element of the non-movant's claim in order to establish a right to summary judgment." *Id.* at 381. Rather, "a 'defending party' may establish a right to judgment by showing facts that negate *any one* of the claimant's elements." *Id.*

Conversely, when "the defending party has moved for summary judgment based on ... affirmative defense[s], the moving party must show 'that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense[s].'" *Hughes v. Davidson–Hues*, 330 S.W.3d 114, 117 (Mo.App.W.D.2010) (quoting *ITT Commercial*, 854 S.W.2d at 381).

To defeat a properly pleaded summary judgment motion, the non-movant must show that there is a genuine dispute as to the facts underlying the movant's right to judgment. *ITT Commercial*, 854 S.W.2d at 382. "[A] 'genuine issue' exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts." *Id.*

### Analysis

■■■ Resolution of this appeal rests, in part, upon an examination of the nature of a lease, and the nature of the legal relationship between a lessor and a lessee once the lessee assigns its interests under the lease. A lease has a dual character. *8182 Md. Assocs., Ltd. P'ship v. Sheehan*, 14 S.W.3d 576, 585 (Mo. banc 2000). As be-

---

5. As we note in our discussion of Point III, since the claims of Back Ventures arise from the *written* contractual terms of the Lease, the relevant statute of limitations may actually derive from section 516.110, though resolution of that issue is not required in the analysis of our ruling today.

tween the lessor and lessee, a lease is a conveyance of an estate in land for years, which creates privity of *estate. Id.* at 585. Privity of estate is attendant to the possession of leased premises. A lease also creates a contractual relationship between the lessor and lessee, with the lessee contractually liable for the obligations of the agreement by privity of *contract. Id.* Though privity of estate and privity of contract are generally co-extensive, that is not the case when the lessee assigns its rights under a lease.

When a lease is assigned, "the lessee parts with his whole term or interest as lessee," and the assignee succeeds to the lessee's interest and "is liable directly to the original lessor on all covenants in the original lease which run with the land." *Siragusa v. Park,* 913 S.W.2d 915, 917 (Mo.App.W.D.1996) (quotation omitted). In other words, the assignor relinquishes possession, with the effect that "[u]pon an assignment by the lessee, the privity of estate between the lessee and lessor is destroyed, and a new privity of estate is created between the assignee and the lessor." *Id.* at 918. "When there is privity of estate, covenants in the original lease that run with the land are binding on the lessor and the assignee." *Megargel Willbrand & Co., LLC v. FAMPAT Ltd. P'ship,* 210 S.W.3d 205, 210 (Mo.App.E.D. 2006) (citing *Weigle v. Rogers,* 202 Mo. App. 520, 213 S.W. 501, 503 (1919)). However, an assignment does *not* create privity of *contract* between the lessor and the new tenant—the assignee—absent an express assumption in the assignment. *8182 Md. Assocs.,* 14 S.W.3d at 586. "Without an assumption, 'the assignee is liable only by virtue of privity of estate ... the assumption generally must be expressed in the assignment....'" *Id.* (quoting *Bauer v. White,* 225 Mo.App. 270, 29 S.W.2d 176, 180 (1930), and citing Milton R. Friedman, *Friedman on Leases* § 7.501c (4th ed.1997)).[6]

Although the privity of estate between the lessor and lessee is destroyed upon assignment by the lessee, "[p]rivity of contract, as contrasted with the more lowly privity of estate" still exists. *Siragusa,* 913 S.W.2d at 918–19 (quotation omitted). "The obligations and liabilities of the lessee to the lessor, arising from express covenants in the lease, are not affected by the lessee's assignment of the lease to a third person...." 49 AM.JUR. 2d *Landlord and Tenant* § 952 (2006). Because privity of contract is not destroyed, the lessee/assignor remains liable on express covenants, *id.,* such as a covenant to repair or for failure to surrender possession of the premises in a prescribed condition. *See McLane v. Wal–Mart Stores, Inc.,* 10 S.W.3d 602, 604 (Mo.App.E.D.2000).

The practical effect of a lessee's assignment of its lease is that an assignee (who succeeds to privity of estate) will be liable to a lessor for the provisions in a lease that are deemed to run with the land, but will have no continuing liability to the lessor for lease obligations accruing after the assignee surrenders the leased premises. However, an assignee who has as-

---

6. Here, there was such an assumption of the lease obligations by SunWest. In paragraph 2 of the assignment, SunWest "agree[d] to perform and discharge all of the covenants, terms, conditions and provisions to be kept, observed and performed by [Safeway] as tenant under the Lease from and after the Effective Date...." This language is recognized as assumption language. "If the assignee as-

sumes the tenant's obligations under the lease he comes under privity of contract...." Milton R. Friedman, *Friedman on Leases* § 7.501a (4th ed.1997); *see also Friedman on Leases* § 7.501c(2)(b) ("An assignee who assumes the tenant's obligations comes into privity of contract as well as privity of estate with the landlord.").

sumed the assignor's lease obligations joins the assignor in privity of contract with the lessor, and will remain jointly liable along with the assignor for performance of lease obligations even after the assignee surrenders possession of the leased premises.

In this appeal, it is uncontroverted that at the time of the 1997 Letter, SunWest was both in privity of estate and privity of contract with Back Ventures, and Safeway's predecessor (PDA) was in privity of contract with Back Ventures. It is also uncontroverted that SunWest remained in privity of estate and privity of contract with Back Ventures following (and notwithstanding) the 1997 letter, though the manner in which, and on what terms, this "resolution" was achieved is not contained in the record. Finally, it is uncontroverted that in 2010, *after* SunWest ceased making payments under the Lease and surrendered possession of the leased premises, SunWest was no longer in privity of estate, but remained in privity of contract with Back Ventures.

What is in dispute is whether Safeway remained in privity of contract with Back Ventures following the 1997 Letter. Depending upon which plausible, though contradictory, construction is placed on the facts in the record before us, Safeway may have remained in privity of contract following the 1997 Letter, or its contractual relationship with Back Ventures may have been irreparably terminated by the 1997 Letter and/or by the subsequent arrangements made by and between Back Ventures and SunWest leading to SunWest remaining in possession of the leased premises. Herein lies the problem with summary judgment at this juncture of the 2011 Lawsuit. We are obligated, as is the trial court, to view the facts in the light most favorable to the non-movant and, accordingly, the facts so viewed reflect that Safeway may have remained in privity of contract with Back Ventures, a possibility that forecloses the entry of summary judgment on this record.[7]

## Point I—The 1997 Letter

■ Given Safeway's predecessor's status as being in privity of *contract,* but not privity of *estate,* with Back Ventures at the time of the 1997 Letter, we now turn to Back Ventures' first claim of error—that the trial court erred in entering summary judgment in favor of Safeway on Safeway's first summary judgment argument[8] that

7. As we discuss in our ruling today, upon review of the record in a light most favorable to the non-movant, the Lease survived the 1997 Letter because one plausible account from the facts is that the party that was in privity of estate with Back Ventures in 1997, SunWest, disputed termination of the Lease and reached agreement with Back Ventures to continue the Lease, which they did through 2009. Pursuant to this plausible account of the facts, the Lease was not terminated in 1997, Safeway's predecessor continued to be in privity of *contract* under the Lease and that privity of *contract* remained intact as of 2010. Upon remand and trial, the fact-finder will be entitled to assess credibility of witnesses and may ultimately conclude that the Lease was, in fact, terminated in 1997, and a new leasehold interest was created between Back Ventures and SunWest. We cannot, however, reach that legal conclusion on the record before us under our lens of review of the grant of summary judgment.

8. The trial court did not specify its reason for granting summary judgment to Safeway. "Where a trial court has granted summary judgment without specifying the basis upon which the motion was granted, this court will affirm the grant of summary judgment under any appropriate theory." *Cent. Mo. Elec. Co-op. v. Balke,* 119 S.W.3d 627, 635 (Mo.App. W.D.2003). Thus, as the appellant, Back Ventures must establish that summary judgment was inappropriate on all grounds offered by the movant, or the trial court's grant of summary judgment must be affirmed. *Id.* Back Ventures has done so in its appeal; hence, the necessity for Points II and III on

the Lease was terminated by the 1997 Letter and, as a matter of law, Safeway owed no legal obligation to Back Ventures in 2010 for damages that are claimed to be derived from a lease that had been terminated approximately twelve to thirteen years earlier. The legal essence of Safeway's first summary judgment argument is that the 1997 Letter destroyed its privity of contract with Back Ventures.

Back Ventures counters by arguing that the Lease was not terminated in 1997. Back Ventures contested Safeway's argument that the Lease terminated in 1997 by presenting undisputed material facts, including but not limited to:

- Back Ventures did not re-enter the leased premises in 1997;
- SunWest made improvements to the leased premises to resolve the dispute with Back Ventures immediately following the issuance of the 1997 Letter;
- SunWest continued to make, and Back Ventures continued to accept, rent payments pursuant to the Lease through December 2009;
- SunWest continued to make, and Back Ventures continued to accept, property tax reimbursement payments pursuant to the Lease for real estate taxes on the leased premises due through 2008;
- SunWest maintained insurance for the leased premises pursuant to the requirements of the Lease through 2009;
- In response to the 2008 Lawsuit, Safeway sought to shield itself from obligations arising under the Lease by tendering its defense to its contractual indemnitor, SunWest, an indemnification that related to obligations arising from the Lease; and
- In response to receiving communication from Back Ventures in 2010 that Safeway was obligated to Back Ven-

tures for alleged breaches of the Lease existing at that time, Safeway ordered an inspection of the leased premises, obtained repair bids from two contractors, and obtained insurance coverage for the leased premises, none of which was necessary if the Lease had been terminated in 1997.

Safeway admitted Back Ventures' additional uncontroverted facts. The question thus squarely framed is whether the uncontroverted facts in this record permitted the trial court to conclude, as a matter of law, that the 1997 Letter irreparably destroyed privity of contract between Safeway and Back Ventures.

■ Under Missouri law, when a tenant defaults on a lease, the landlord has three options:

(1) [r]emain out of possession, treat the lease as subsisting and collect rent; (2) give notice to tenant, resume possession of the premises and attempt to relet in order to mitigate any damages; or (3) reenter, resume possession in its own right and, effectively, terminate the lease.

*JCBC, L.L.C. v. Rollstock, Inc.,* 22 S.W.3d 197, 200 (Mo.App.W.D.2000) (internal quotation omitted). Here, it is uncontroverted that although Back Ventures gave notice of default in 1997, it did not resume possession of the leased premises to relet. Back Ventures also did not re-enter and resume possession of its own right as to effectively terminate the lease. Thus, it is uncontroverted that notwithstanding Back Ventures' notice of termination by its 1997 Letter, it did not exercise options (2) or (3) above. Instead, after Back Ventures gave notice of default, it remained out of possession, and it continued to collect rent from SunWest.

appeal and our corresponding discussion thereof in our ruling today.

These uncontroverted facts permit two inferences. Either Back Ventures elected to ignore, or otherwise resolved, the default which was the subject of its 1997 Letter such that it "treat[ed] the lease as subsisting," *id.*, or it negotiated a new lease agreement with SunWest that permitted SunWest to remain in the leased premises.

As to the first possible inference, it has long been recognized that "[a] landlord's notice of termination of lease may be withdrawn, whether given in error or otherwise, if withdrawn before being acted upon by the tenant." *Friedman on Leases* § 16.2. Our record is silent on whether discussions between SunWest and Back Ventures after the 1997 Letter led Back Ventures to withdraw its termination of the Lease. Our record is silent on whether Safeway "acted upon" the 1997 Letter to its detriment as to prevent withdrawal of the termination, at least as to Safeway. Our record is silent on whether Safeway was aware that notwithstanding the 1997 Letter, SunWest remained in possession of the leased premises performing as a tenant on terms and conditions that were consistent with the original Lease provisions. Without these facts, it was impossible for the trial court to rule, as a matter of law, that the 1997 Letter destroyed privity of contract between Safeway and Back Ventures. Not surprisingly, treatises addressing the subject of whether a lessee has relied on a lessor's termination as to prevent its withdrawal note that "[i]ssues of fact may make it doubtful whether this rule applies." *Id.* at § 16.2.

With respect to the second possible inference, there is little question that if in response to the 1997 Letter, Back Ventures negotiated a new lease with SunWest

(as opposed to withdrawing its termination and resuming the original Lease), that act could have destroyed privity of contract between Safeway and Back Ventures. "Contracts between a landlord and an assignee modifying the terms of a lease that change the obligations undertaken by the original tenant . . . or that in substance create a new tenancy, have been held a release of the [assignor]." *Id.* at § 7.502. Here, however, there are no facts in the record addressing the communications between SunWest and Back Ventures following the 1997 Letter, and thus no facts from which the trial court could have concluded as a matter of law that SunWest and Back Ventures negotiated a new lease that had the legal effect of replacing the original Lease, and destroying Safeway's privity of contract.

At this juncture of the proceeding, it is not clear what *actually* transpired following the 1997 Letter. Because one plausible interpretation of the facts in our present record is that Back Ventures withdrew its termination of the Lease and that Safeway did not rely to its detriment on the termination before it was withdrawn, summary judgment was not appropriate if based on Safeway's argument that it could not be liable in 2010 for a lease that had been terminated in 1997.

Point I is granted.

## Point II—Affirmative Defenses of Waiver, Estoppel, and Laches

■■■■■ Back Ventures next argues that the trial court erred in granting summary judgment in favor of Safeway because the undisputed facts before the trial court did not establish that Back Ventures' claims against Safeway were precluded by the affirmative defenses of waiver,[9] estop-

---

9. Waiver is "the intentional relinquishment of a known right." *Shahan v. Shahan,* 988 S.W.2d 529, 534 (Mo. banc 1999) (internal quotation omitted). "Waiver may be express or it may be implied by conduct that clearly and unequivocally shows a purpose by the

pel,[10] or laches.[11] Safeway had the burden of proof on each of its affirmative defenses. *Moore v. Weeks,* 85 S.W.3d 709, 721 (Mo. App.W.D.2002). Safeway's affirmative defenses are plainly alleged in the alternative to its position that the Lease was terminated by the 1997 Letter, as the defenses presume that Safeway remained in contractual privity with Back Ventures after the 1997 Letter.

The premise of Safeway's argument as to these affirmative defenses is that, as it states:

> [b]etween November 1997 and February 2010, the lessor provided no notice of default under the lease; it did not request or advise of any separate agreements or arrangements it made with SunWest concerning maintenance of the property; provided no notice to Safeway that the building on the Burlington property had lain vacant and unattended since 2000 or that SunWest continued to make payments under the lease while leaving the building vacant.

First, we note that Safeway couches its notice argument in numerous instances in its motion for summary judgment as one of notice "under the lease," which by the Lease terms connotes *formal written* notice *from the lessor.* Conveniently, this ignores whether Safeway (or its predecessor) had *actual* notice of the condition of the leased premises as well as SunWest's continued possession and rent, property tax, and insurance payments for the leased premises and whether such possession and payments are pursuant to the Lease or a different contractual document. Frankly, these facts are not fully developed in the record before us. Yet, when we view the undisputed facts in the light most favorable to the non-movant, it is reasonable to infer that, at all relevant times, Safeway had *actual* notice of the condition and maintenance of the leased premises, SunWest's physical possession or lack thereof of the leased premises, and the continuing obligations of SunWest and Safeway under the terms of the Lease and SunWest's corresponding continuing obligations un-

---

[party] to relinquish a contractual right." *Id.* "[W]aiver involves the act, conduct, or statement of one of the parties to the contract only [and] involves both knowledge and intent...." *Link v. Kroenke,* 909 S.W.2d 740, 746 (Mo.App.W.D.1995).

10. The doctrine of equitable estoppel seeks to foreclose a party from denying its expressed or implied admission that has, in good faith and in pursuance of its purpose, been accepted and relied upon by another. *Farmland Indus., Inc. v. Bittner,* 920 S.W.2d 581, 583 (Mo.App.W.D.1996). The three essential elements of the doctrine are: "(1) an admission, statement, or act inconsistent with the claim afterwards asserted and sued upon; (2) action by the other party on the faith of the admission, statement, or act; and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement, or act." *Id.* The doctrine is not a favorite of the law, will not be applied lightly, and can only be used when each element clearly appears. *Id.*

11. " 'Laches' is the neglect for an unreasonable and unexplained length of time under circumstances permitting diligence, to do what in law, should have been done." *Metro. St. Louis Sewer Dist. v. Zykan,* 495 S.W.2d 643, 656 (Mo.1973) (internal quotation omitted). "There is no fixed period within which a person must assert his claim or be barred by laches." *Id.* (internal quotation omitted). "Laches is a question of fact to be determined from all the evidence and circumstances adduced at trial." *Id.* at 657 (internal quotation omitted). The doctrine is not favored by equity and is used primarily to prevent injustice. *Moore v. Weeks,* 85 S.W.3d 709, 721 (Mo.App. W.D.2002). "Mere delay in asserting a right does not of itself constitute laches; the delay involved must work to the disadvantage and prejudice of the defendant." *Zykan,* 495 S.W.2d at 656–57 (internal quotation omitted).

der the terms of the assignment. For example, Safeway's action in response to the 2008 Lawsuit was to seek indemnification from its assignee. And, in response to communication of breach of the Lease in 2010, Safeway obtained an inspection, multiple repair bids, and insurance coverage for the leased premises. While these actions may be consistent with a party that had no notice of SunWest's failure to fulfill all of its obligations under the Lease or a party to a lease that no longer believes the Lease is operable as to that party, these actions are also consistent with a party that was, at all relevant times, fully cognizant of SunWest's shortcomings and that party's continuing privity of contract obligations under the Lease.

Further, on the record before us and the reasonable inferences derived therefrom, Back Ventures may have provided all of the formal notices it was required to provide to Safeway. For example, on the record before us, we know of three occasions in which breach of the Lease was claimed by Back Ventures. First, the 1997 Letter detailed alleged breaches of the Lease. Yet, one reasonable inference from the record before us suggests that SunWest made repairs to the satisfaction of Back Ventures in 1997 and that the Lease was not terminated at that time. Second, the 2008 Lawsuit detailed alleged breaches of the Lease and specifically referenced the City of North Kansas City's notices and orders of demolition relating to the unsafe condition of the leased premises. Yet, the reasonable inference from the record before us suggests that SunWest again made repairs to the satisfaction of

the City of North Kansas City and Back Ventures, such that the leased premises were not demolished and the 2008 Lawsuit was dismissed. Third, the February 2010 notification to Safeway provided notice of alleged breaches of the Lease, specifically notifying Safeway of the deteriorated condition of the leased premises in violation of the Lease. Once again, the reasonable inference from the record before us suggests that Safeway undertook the responsibility to satisfy its obligations under the Lease by obtaining inspections, repair bids, and insurance coverage for the leased premises.

On each of these occasions in 1997, 2008, and 2010, alleged breaches of the Lease were formally communicated to Safeway or Safeway's predecessor. Though the evidence of this case at trial may indicate that there were other instances of breach of the Lease between 1997 and 2010 that may have triggered other notice obligations upon Back Ventures, the present record before us does not undisputedly identify what those breaches were and when Back Ventures should have reasonably recognized and communicated such breaches to either SunWest or Safeway or both.[12]

On the record before us and the reasonable inferences from that record viewed in the light most favorable to Back Ventures, we cannot conclude that, as a matter of law: (1) Back Ventures "intentionally relinquished" Safeway's privity of contract obligations under the Lease; (2) Back Ventures neglected to provide notice of breaches under the Lease "for an unrea-

---

12. Likewise, though we need not decide this issue in our ruling today, this court has previously indicated that upon a lessee's assignment of a lease to an assignee, "the covenants and agreements of the [lessor] contained in the original lease were no longer for [the lessee's] benefit, but rather inured to [the assignee]." *Siragusa v. Park*, 913 S.W.2d 915, 918 (Mo.App.W.D.1996). Thus, this may bring into question what formal notice the terms of the Lease obligated Back Ventures to provide to Safeway after the assignment of the Lease to SunWest in 1988.

sonable and unexplained length of time under circumstances permitting diligence, to do what in law, should have been done"; or that (3) Back Ventures has engaged in "an admission, statement, or act inconsistent with" Back Ventures' claims against Safeway in the 2011 Lawsuit.

Because the undisputed facts do not establish Safeway's right to assert the affirmative defenses of waiver, estoppel, or laches, in support of its motion for summary judgment, Point II is granted.

## Point III—Statute of Limitations

 Finally, Back Ventures asserts that the trial court erred in granting summary judgment in favor of Safeway because Back Ventures' claims were not barred by the applicable statute of limitations.[13]

Back Ventures argues that its claims accrued either in December 2009, when SunWest advised Back Ventures that it would no longer meet its obligations under the Lease, or after March 9, 2011, when it was forced to demolish the building on the Burlington Property to avoid condemnation by the City. Safeway contends that the 1997 Letter is the triggering event for the accrual of Back Ventures' cause of action.

 "A cause of action for breach of contract does not accrue until after the contract is breached." *Real Estate Investors Four, Inc. v. Am. Design Group Inc.*, 46 S.W.3d 51, 59 (Mo.App.E.D.2001). " 'The triggering event of the applicable statute of limitations is when damage is sustained and becomes capable of ascertainment.' " *Id.* (quoting *Bus. Men's As-*

*surance Co. of Am. v. Graham*, 984 S.W.2d 501, 507 (Mo. banc 1999)). Here, one plausible account of the facts of this case is that the damages claimed in the 2011 Lawsuit were not sustained until December 2009 when SunWest notified Back Ventures that it would no longer meet its obligations under the Lease, a lease which had not been terminated previously in 1997. *See id.* (holding damage was sustained in cause of action based on breach of contract for unpaid rent and failure to maintain the premises and return them in good order and repair when tenant failed to pay the rent due and vacated the premises in damaged condition).

Once again, the principal problem on appeal of the grant of summary judgment is that the facts on this topic have not been fully developed at this juncture of the proceedings below. Though the 1997 Letter identified similar previous breaches of covenants contained in the Lease, one reasonable inference from this record is that SunWest cured the complained-of defaults to the satisfaction of Back Ventures in 1997 such that the Lease was not terminated in 1997. The same may be said of Back Ventures' claim of breach of the Lease in the 2008 Lawsuit since, after the lawsuit was filed, SunWest again apparently satisfied both Back Ventures and the City of North Kansas City that sufficient repairs would be made to bring the leased premises into a compliant physical condition—resulting in dismissal of the 2008 Lawsuit. The 2011 Lawsuit is not claiming damages relating to any alleged breach that occurred in 1997. To the contrary, Back Ventures is suing for damages aris-

---

**13.** Safeway claims the five-year statute of limitations for breach of contract actions, § 516.120, applies to this case rather than the ten-year statute of limitations, § 516.110, for actions upon writings (*i.e.*, written lease agreement). Irrespective of which limitations period is applied to this case, neither limitations period would bar the 2011 Lawsuit via

summary judgment, in light of our ruling that one reasonable inference from the undisputed facts of this case is that the cause of action accrued in December 2009. Under this plausible account of the facts presently developed in the record before us, the 2011 Lawsuit was timely under either limitations period.

ing from a failure to make lease payments after 2009 and for vacating the leased premises in 2010 in a damaged or deteriorated condition, presumably in a condition that had deteriorated since the time of SunWest's repairs that led to the dismissal of the 2008 Lawsuit.

Given our standard of review that requires us to view the facts in the light most favorable to the non-movant, we cannot conclude, at this juncture of the proceedings, that the 2011 Lawsuit was not timely filed.

Point III is granted.

### Conclusion

Safeway failed to show that it was entitled to judgment as a matter of law on any of the grounds argued in its summary judgment motion. Thus, the trial court erred in granting summary judgment in favor of Safeway. The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

LISA WHITE HARDWICK, Presiding Judge, and CYNTHIA L. MARTIN, Judge, concur.